DONNA W. AARHUS v. WAKE FOREST UNIVERSITY

No. 8121SC878

(Filed 1 June 1982)

1. **Evidence § 40— opinion testimony—use of "guess"**

   A witness's testimony that he called a certain office "I would guess for you 4 or 5 times" was an expression of opinion based upon his personal knowledge, not mere conjecture, and was improperly excluded.

2. **Landlord and Tenant § 1; Trial § 6.1— stipulation not admission of lessor-lessee relationship**

   A stipulation stating that defendant "leased" premises and facilities for food service to plaintiff's employer was not intended as an admission that a lessor-lessee relationship existed between defendant and plaintiff's employer and that plaintiff's employer was thus not an independent contractor.

**3. Master and Servant §§ 3.1, 19; Negligence § 52.1— employee of independent contractor—invitee—duty of premises owner**

     Plaintiff's employer was an independent contractor, not a lessee of defendant university, where the contract between defendant and plaintiff's employer granted the employer the right to manage the food service facilities on its campus; required the employer to provide food and beverages to serve as meals for defendant; required defendant to provide equipped facilities for food service, to make all equipment repairs and replacements, and to furnish maintenance and repair services for the premises; and required the employer to maintain an adequate staff but gave defendant the right of approval of the employees hired by the employer during the contract period and for six months thereafter. Therefore, plaintiff employee was an invitee of defendant, and defendant owed plaintiff the duty of due care under all the circumstances.

**4. Master and Servant § 19; Negligence § 57.3— employee of independent contractor—fall of table on foot—negligence of premises owner**

     In an action to recover damages for an injury to plaintiff caused by the collapse of a cash register table onto plaintiff's foot while she was working on defendant university's premises as a cashier for an independent food service contractor and thus was an invitee of defendant, plaintiff's evidence was sufficient to be submitted to the jury on the issue of defendant's negligence in failing to repair or replace the table or to warn plaintiff of its condition where it tended to show that defendant's superintendent of buildings was aware of the wobbly condition of the cash register table and, after looking at the table on one occasion, stated that "we've got to get this done," but no repair work was done on the table.

APPEAL by plaintiff from *Wood, Judge.* Judgment entered 1 April 1981 in Superior Court, FORSYTH County. Heard in the Court of Appeals 6 April 1982.

This is a negligence action arising from an injury to plaintiff caused by the collapse of a cash register table onto her foot. At the time of this incident, plaintiff was employed as a cashier by ARA Food Services, Inc. [hereinafter referred to as ARA], which operated the cafeteria on defendant's campus. Plaintiff alleges that defendant was negligent in that (1) its agents and employees failed to repair or replace the table after repeated requests from plaintiff's employer to do so, (2) defendant's agents and employees failed to warn plaintiff of the defective condition of the table, (3) defendant's agents and employees failed to authorize or request plaintiff's employer to replace or repair the table, (4) defendant failed to provide a safe place to work for plaintiff, and (5) defendant failed to provide a table suitable for the purposes for which it was used. Defendant answered, denied plaintiff's allegations, and asserted the further defenses that

(1) the accident was unavoidable, (2) plaintiff was contributorily negligent, (3) plaintiff assumed the risk of injury since such risk was open and obvious, (4) plaintiff's employer's negligence is a bar to its subrogation interests or that of its workers' compensation carrier, and (5) the negligence of plaintiff and her employer constituted independent causes which intervened between any negligence of defendant and plaintiff's injuries.

At trial, the judge granted defendant's motion for a directed verdict at the close of plaintiff's evidence on the grounds that (1) plaintiff's evidence did not show defendant's negligence, (2) the intervening negligence of plaintiff's employer was the proximate cause of the accident, and (3) the negligence of plaintiff's employer would have combined with defendant's negligence—if there had been any such negligence—and barred the subrogation claim as a matter of law. Plaintiff appeals from the judgment entered thereon.

*House, Blanco, Randolph & Osborn, by Clyde C. Randolph Jr. and Reginald F. Combs, for plaintiff-appellant.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by W. Thompson Comerford Jr. and John F. Mitchell, for defendant-appellee.*

HILL, Judge.

Plaintiff testified that about 10 a.m. on 2 September 1976, she "closed down" her own cash register and relieved a co-worker, Mary Dingman, at cash register "D" in the cafeteria on defendant's campus. She began working, but the register would not ring. Plaintiff in a free moment looked for the plug with no success. When she again had no customers, plaintiff testified that she "decided to bend around and see where that outlet was, and it came down. The leg on the table came down and the cash register with it. The right leg of the table hit the top of my foot, on the arch." Plaintiff worked at cash register "D" about five minutes before the accident. She further testified that she had not noticed "any difficulty or any peculiarity about the condition of the cash register table" two days earlier when she worked with cash register "D," and that "[n]o one had made any statement to me or in my presence about the condition of the cash register table before I was injured."

Mary Dingman, the regular operator of cash register "D," testified that she noticed a problem with one of the legs of the cash register table and told her supervisor, Lucille Smith Jackson, of the problem about six weeks before the accident. She stated, "I had no trouble seeing the problem with the table because it was wobbly. I looked at it and saw what it was. You couldn't help but see it at that time. The table was wobbly. It wasn't lopsided." One of Dingman's supervisors told her not to worry about the condition of the table, it would be fixed.

Lucille Smith Jackson supervised the cashiers at the cafeteria at the time of the accident. She testified,

> During the 30 days before the accident to [plaintiff], I observed that cash register D was shaky, very shaky and both legs were really shaky, but none of them were out of proportion that I could see, but I felt that they were going to collapse on someone. I reported what I had observed concerning the condition of cash register D to Mr. Pardue, my supervisor. . . . It was before the accident. I made communication to Mr. Pardue concerning the condition of this particular table quite a few times.

Robert Ernest Pardue, production manager of the cafeteria for ARA at the time of the accident, testified that he had talked to Royce Weatherly, defendant's superintendent of buildings, concerning the condition of the table under cash register "D." Pardue described the problem as "loose legs." He stated that "it looked like probably a screw was with—one screw was holding them, and, . . ., then we'd knock them back under there and try to straighten them up. When I say 'we' I mean myself, or some other employee of ARA." If one looked for the problem, Pardue testified, one could see it. Weatherly came to the cafeteria on one occasion, looked at the table, and told Pardue, " 'Yes, Bob, we've got to get this done.' " This conversation occurred "right in the neighborhood of the time that the accident happened, right before that . . . ." Pardue testified that he also telephoned Weatherly's office about the condition of the table on another occasion, but he never submitted a written request to have any work done on the table.

[1] In her first assignment of error, plaintiff argues that the trial judge erred in refusing to allow the following testimony of Pardue:

Q. Do you recall approximately how many occasions you called Mr. Weatherly's office concerning the condition on cash register D?

A. The exact number I couldn't, I couldn't recall, but I would guess for you 4 or 5 times.

MR. COMERFORD: Well, I object and move to strike.

THE COURT: How many times?

A. 4 or 5 times.

THE COURT: Sustained. Now don't consider that answer.

Q. Give your best recollection as to the number of times that you telephone Mr. Weatherly's office concerning the condition of cash register D?

A. 4. May I—Your Honor—May I clear this up?

THE COURT: Now, I will sustain the objection. I instruct you to strike that answer from your mind as to that.

We sustain plaintiff's assignment.

"[T]he word 'guess' does not necessarily mean mere conjecture, but may connote judgment. If a person is asked to estimate the number of people in a crowd, he may say 'I guess' a certain number. By either term he is expressing an opinion based on observation."

*State v. Clayton,* 272 N.C. 377, 382, 158 S.E.2d 557, 561 (1968), *quoting Finnerty v. Darby,* 391 Pa. 300, 310, 138 A.2d 117, 122 (1958). *Accord Boyd v. Blake,* 1 N.C. App. 20, 159 S.E.2d 256 (1968). Thus, the mere fact that a witness says he is "guessing" does not *per se* exclude the evidence as conjecture, but goes to its weight for the jury to consider. *See State v. Clayton, supra.*

Pardue's excluded testimony that he called Weatherly's office about the table, "I would guess for you 4 or 5 times," was an expression of opinion based upon his personal knowledge, not "mere conjecture." *See* 1 Stansbury's N.C. Evidence (Brandis rev. 1973) § 122, pp. 382-83. Therefore, the jury should have been allowed to weigh Pardue's excluded testimony.

Plaintiff also argues that the trial judge erred in allowing defendant's motion for directed verdict at the conclusion of his

evidence on the grounds stated above. The question raised by a directed verdict motion is whether the evidence is sufficient to go to the jury. *Rappaport v. Days Inn of America, Inc.*, 296 N.C. 382, 250 S.E.2d 245 (1979); *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E.2d 396 (1971). In passing upon such a motion, the trial judge must consider the evidence in the light most favorable to the non-movant, resolving all conflicts and giving to him the benefit of every inference reasonably drawn in his favor. *Rappaport v. Days Inn of America, Inc., supra; Summey v. Cauthen*, 283 N.,C. 640, 197 S.E.2d 549 (1973). A directed verdict motion by defendant may be granted only if the evidence is insufficient as a matter of law to justify a verdict for plaintiff. *Husketh v. Convenient Systems, Inc.*, 295 N.C. 459, 245 S.E.2d 507 (1978); *Dickinson v. Pake*, 284 N.C. 576, 201 S.E.2d 897 (1974).

[2]    Since defendant's duty to plaintiff arises from the relationship subsisting between them, *Matthieu v. Piedmont Natural Gas Co.*, 269 N.C. 212, 152 S.E.2d 336 (1967), our analysis of plaintiff's argument begins with the parties' disagreement over the proper characterization of the contractual relationship between defendant and ARA. Defendant contends that a stipulation by the parties which was read to the jury controls this question. The stipulation reads, in part, as follows:

> On or about September 2, 1976, the Plaintiff was employed by ARA Food Service, Inc., which Corporation had a contract with Defendant, Wake Forest University, to provide food and services to the Defendant. Pursuant to that agreement, the Defendant *leased* premises and facilities for food service to ARA Food Service, Inc.

(Emphasis added.) Thus, defendant argues that it, as lessor, is not liable for injuries to persons on the leased premises resulting from disrepair, even when the lessor is under a contractual obligation in the lease to repair and maintain the premises. *See* 8 Strong's N.C. Index 3d, Landlord and Tenant § 8.2, pp. 241-42. Despite the stipulation quoted above, however, plaintiff argues that ARA is an independent contractor, and that as ARA's employee, defendant owed her a duty of "due care under all circumstances." We agree with plaintiff.

> Stipulations are viewed favorably by the courts because their usage tends to simplify, shorten, or settle litigation, as well

as save costs to litigants. *Rickert v. Rickert,* 282 N.C. 373, 193 S.E.2d 79 (1972); *Rural Plumbing and Heating, Inc. v. H. C. Jones Construction Co.,* 268 N.C. 23, 149 S.E.2d 625 (1966); *Chisolm v. Hall,* 255 N.C. 374, 121 S.E.2d 726 (1961). Yet, the effect or operation of a stipulation will not be extended by the courts beyond the limits set by the parties or by the law. *Rickert v. Rickert, supra; Lumber Co. v. Lumber Co.,* 137 N.C. 431, 49 S.E. 946 (1905). In determining the extent of the stipulation, it is appropriate to look to the circumstances under which it was entered, as well as to the intentions of the parties as expressed by the agreement. *Rickert v. Rickert, supra.* Stipulations will receive a reasonable construction so as to effect the intentions of the parties, but in ascertaining the intentions of the parties, the language employed in the agreement will not be construed in such a manner that a fact which is obviously intended to be controverted is admitted or that a right which is plainly not intended to be waived is relinquished.

*Outer Banks Contractors, Inc. v. Forbes,* 302 N.C. 599, 604-05, 276 S.E.2d 375, 379-80 (1981).

To hold the parties in this action to a theory that defendant's liability to plaintiff is controlled by a lessor-lessee relationship between defendant and ARA would be to construe the stipulation quoted above as admitting "a fact which is obviously intended to be controverted . . . ." *Id.* at 604, 276 S.E.2d at 380. For this reason, we do not believe that the parties intended that the nature of their relationship be admitted. Thus, we now must determine the true nature of the contractual relationship between defendant and ARA.

On 18 June 1968, defendant's Board of Trustees and Slater Corporation entered into an agreement providing, in part, as follows:

1. GRANT TO SLATER: College hereby grants to Slater the right to sell food, food products, candy and non-alcoholic beverages in the food service facilities on its campus in Winston-Salem, North Carolina, and further hereby agrees to purchase from Slater all of the foregoing items to the extent it sells them to its students, faculty, staff and guests.

2. FACILITIES AND EQUIPMENT: College will provide Slater with all facilities for food service including adequate office equipment and furniture (together with adequate sanitary toilet facilities and dressing rooms for Slater's employees) completely equipped and ready to operate, together with such heat, fuel, refrigeration and utilities service reasonably required for efficient operation. In the event that College requests service of food other than in the Student Union Building, College will furnish, at no cost to Slater, all transportation necessary to enable Slater to provide such service. College will make all equipment repairs and replacements and will furnish building maintenance and repair service for the premises. College will also provide an adequate initial inventory of glassware, chinaware and silverware but Slater will maintain the inventory of these items at its expense. Slater will be responsible for routine cleaning and housekeeping in the food preparation and service areas and for the cleaning of dining room tables, chairs and floors, but College will provide regular cleaning service for dining room walls, windows, light fixtures, draperies and blinds, and periodic buffing and waxing of floors. Slater will maintain high standards of sanitation; however, College will be responsible for trash and garbage removal and extermination service.

3. SLATER AGREES:

A. FOOD SERVICE: To purchase, prepare and serve food, food products, candy and non-alcoholic beverages on the campus and to provide College with meals for College to resell to its students, faculty, staff and guests on such hourly schedule as may be mutually agreed upon.

B. MENUS: To submit menus at least one (1) week in advance of service to such person as College shall designate.

C. HEALTH EXAMINATIONS: To cause all of its employees assigned to duty on College's premises to submit to periodic health examinations at least as frequent and as stringent as required by law, and to submit satisfactory evidence of compliance with all health regulations to College's medical department upon request.

D. INSURANCE: To furnish College with a certificate in form acceptable to College, certifying that Slater carries workmen's compensation, comprehensive (including products), bodily injury and property damage liability insurance in such amounts as are acceptable to College. College hereby waives any and all right of recovery from Slater for loss caused by perils defined in fire, extended coverage and sprinkler leakage insurance policies.

E. RETURN OF EQUIPMENT: To return to College at the expiration of this contract the food service premises and all equipment furnished by College in the condition in which received, except for ordinary wear and tear and except to the extent that said premises or equipment may have been lost or damaged by fire, flood or other unavoidable occurrence, or theft by persons other than employees of Slater without negligence on the part of Slater or its employees.

4. PERSONNEL: Slater will at all times maintain an adequate staff of its employees on duty on College's campus for efficient operation, thereat, and to provide expert administrative, dietetic, purchasing, equipment consulting and personnel advice and supervision. Slater employees will strictly adhere to campus regulations regarding personal behavior. Slater agrees to assign to duty at College only employees acceptable to College.

Slater agrees that no employees of College will be hired by Slater without specific permission of College for the period of this contract and six months thereafter. College agrees that no employees of Slater will be hired by College without specific permission of Slater for the period of this contract and six months thereafter.

5. STUDENT LABOR: College will furnish Slater with student labor to an extent mutually agreed upon, for which Slater will reimburse College at a rate which will at least be equal to the applicable state and/or federal minimum wage regulations.

The contract also provides that Slater must submit to defendant a statement of "gross manual sales" during each accounting period, and that defendant "shall have full access to the food service

facilities with or without notice," including records which defendant may audit at any time.

> An independent contractor has been defined as one who exercises an independent employment, contracts to do a piece of work according to his own judgment and methods, and without being subject to his employer, except as to the result of the work, and who has the right to employ and direct the action of other workmen in the prosecution of the work without interference or right of control on the part of his employer.

*Askew v. Leonard Tire Co.*, 264 N.C. 168, 177, 141 S.E.2d 280, 287 (1965). The vital test is whether the employer "has or has not retained the right of control or superintendence over the contractor or employee as to details." *Hayes v. Board of Trustees of Elon College*, 224 N.C. 11, 15, 29 S.E.2d 137, 140 (1944). *See also Cooper v. Asheville Citizen-Times Publishing Company, Inc.*, 258 N.C. 578, 129 S.E.2d 107 (1963).

[3] The contract quoted above indicates that defendant granted to Slater, an independent entity, the right to manage the food service facilities on its campus. While defendant is to provide equipped facilities for food service, including responsibilities to "make all equipment repairs and replacements" and to "furnish building maintenance and repair service for the premises," Slater is to provide the food and beverages to serve as meals for defendant. It is Slater's responsibility to provide and maintain an adequate staff, but defendant retains approval of the employees hired by Slater during the contract period and six months thereafter. These facts are sufficient to show that Slater exercises an independent employment and generally employs and directs the activities of its employees without excessive interference by defendant. Specifically, defendant has not retained the right of control over ARA as to the details of its work. Therefore, from the record before us, we conclude that ARA is an independent contractor of defendant, not a lessee, and that defendant's liability to plaintiff, if any, must be governed under that relationship.

As in *Maness v. Fowler-Jones Construction Co.*, 10 N.C. App. 592, 179 S.E. 2d 816, *cert. denied*, 278 N.C. 522, 180 S.E. 2d 610 (1971), plaintiff's action in the present case lies in tort and the contract between defendant and ARA "merely furnishes the occa-

sion, or creates the relationship which furnishes the occasion, for the tort." *Toone v. Adams*, 262 N.C. 403, 407, 137 S.E.2d 132, 135 (1964). *Accord Pinnix v. Toomey*, 242 N.C. 358, 87 S.E.2d 893 (1955). Plaintiff, an employee of ARA, defendant's independent contractor, was an invitee of defendant. "Defendant's duty to plaintiff, therefore, was one of due care under all the circumstances." *Spivey v. The Babcock & Wilcox Co.*, 264 N.C. 387, 388, 141 S.E.2d 808, 810 (1965). *Accord Maness v. Fowler-Jones Construction Co., supra.*

[4] On the issue of defendant's negligence, it is clear that Weatherly, defendant's superintendent of buildings, was aware of the condition of the cash register table. In fact, Weatherly told Purdue, then ARA's production manager, that "we've got to get this done." Plaintiff's co-worker, Dingman, also was aware of the "wobbly" table; she was the regular operator of cash register "D." However, Dingman was told by her supervisors not to worry about the condition of the table, it would be fixed. Under this evidence, it was for the jury to determine whether defendant breached its duty to plaintiff of due care under all circumstances in failing to repair or replace the table or warn plaintiff of its condition. Therefore, the trial judge erred in granting a directed verdict for defendant on the ground that she has failed to show defendant's negligence. Our decision that plaintiff's evidence is sufficient to go to the jury on the above issue necessarily requires reversal of defendant's directed verdict on the remaining grounds specified by the trial judge.

We do not address plaintiff's second assignment of error concerning the exclusion of testimony elicited by a hypothetical question because the issue is unlikely to arise in a subsequent trial. *See* G.S. 8-58.12 & .13; *see also Simons v. Georgiade*, 55 N.C. App. 483, 286 S.E.2d 596, *disc. rev. denied*, 305 N.C. 587, 292 S.E.2d 571 (1982).

For these reasons, the trial judge erred in allowing defendant's motion for a directed verdict.

New Trial.

Judge BECTON concurs.

Judge HEDRICK concurs in result only.