STATE OF NORTH CAROLINA v. MICHAEL LEE FULLWOOD

No. 37A86

(Filed 3 November 1988)

1. **Criminal Law § 98.2— Rule 615 motion to sequester witnesses—discretion of court**

   A motion to sequester witnesses made pursuant to N.C.G.S. § 8C-1, Rule 615, like a motion under N.C.G.S. § 15A-1225, rests in the discretion of the trial judge.

2. **Criminal Law § 98.2— refusal to sequester witnesses—no abuse of discretion**

   The trial court did not abuse its discretion in the denial of defendant's Rule 615 motion to sequester witnesses where the record indicates that the court carefully considered defendant's motion and denied it only after hearing and weighing the concerns expressed by both defendant and the State, and where the court determined that there were no eyewitnesses to the crimes and that defendant had copies of the pre-trial statements of the witnesses to use in cross-examination. N.C.G.S. § 8C-1, Rule 615.

3. **Criminal Law § 135.3; Jury § 7.14— capital punishment views—peremptory challenges**

   Both the prosecutor and defense counsel may exercise peremptory challenges to exclude jurors based upon their voir dire testimony regarding their attitude toward capital punishment.

4. **Constitutional Law § 61; Criminal Law § 135.3; Jury § 7.11— death penalty views of jurors—fair cross-section principle inapplicable**

   The fair cross-section of the community principle does not extend to petit juries. Even if fair cross-section analysis were so extended, jurors equivocal as to the death penalty do not qualify as a distinctive group for fair cross-section purposes.

5. **Criminal Law § 82.2— physician-patient privilege—waiver by trial court—no illegal search**

   The trial court did not abuse its discretion in ruling that the physician-patient privilege should be waived and that a surgeon's testimony concerning defendant's wounds should be allowed into evidence even though investigators obtained information from the surgeon before the trial court compelled his testimony. Moreover, evidence voluntarily given by the surgeon to the police during a criminal investigation was not the product of an illegal search. Assuming error *arguendo* in the admission of the surgeon's testimony, such error was clearly harmless where two other doctors testified to essentially the same facts and opinions stated by the surgeon.

6. **Criminal Law § 53— expert medical testimony—use of "guess"**

   A pathologist's use of the word "guess" did not render inadmissible his opinion as to the length of time between the victim's injuries and her death.

**7. Criminal Law § 53— medical testimony—objection not request for underlying facts**

The trial court was not required to recognize defendant's objection to a pathologist's opinion testimony as a request under N.C.G.S. § 8C-1, Rule 705 for disclosure of the facts and data underlying the opinion where defendant made no specific request pursuant to Rule 705.

**8. Criminal Law § 169— exclusion of testimony—relevance not obvious—failure to make offer of proof**

The exclusion of testimony will not be held prejudicial where the relevance of the proffered testimony is not obvious from the record and defendant did not make an offer of proof showing the substance of what the witness would have testified. N.C.G.S. § 8C-1, Rule 402 (1988).

**9. Criminal Law § 73.4— statement in emergency room—refusal to admit as excited utterance**

The trial court in a first degree murder case did not err in refusing to admit defendant's emergency room statement that his girlfriend (the victim) had stabbed him as an excited utterance under N.C.G.S. § 8C-1, Rule 803(2) where defendant made the statement over an hour after the murder was discovered, and the trial court could properly conclude that defendant had time to manufacture the statement and did not make it spontaneously.

**10. Criminal Law § 33— exclusion of relevant evidence—waste of time**

The trial court in a first degree murder case did not err in refusing to admit the entire packet of defendant's medical records on the ground that it would be a waste of time where the jury heard plenary testimony concerning wounds received by defendant, and the significance to the case of the excluded portions of defendant's records was not established. N.C.G.S. § 8C-1, Rule 403 (1988).

**11. Criminal Law § 102.6; Homicide § 4.3— first degree murder—jury argument—cold state of blood—act in passion immaterial**

The prosecutor's jury argument in a first degree murder case that the State has to prove that defendant formed the intent to kill the victim in a cold state of mind or blood but whether he was in passion when he killed her is immaterial was a correct statement of the law and properly permitted by the trial court.

**12. Homicide § 25.2— first degree murder—instructions on intent to kill**

While the trial court's instructions on premeditation and deliberation were in form different from those requested by defendant, they were the same in substance where the requested instructions stressed that the intent to kill must have been formed in a "cold state of blood," and the instructions given emphasized this by stating that the intent to kill must have been formed "in a cool state of mind" and not "during some suddenly aroused violent passion." Furthermore, the instructions given were a correct statement of the law.

---

**State v. Fullwood**

---

**13. Homicide § 25.2— premeditation and deliberation—lethal blows after victim felled—supporting evidence**

The trial court's instruction that premeditation and deliberation may be proved by the infliction of lethal blows after the victim was felled did not permit the jury to infer premeditation and deliberation from factors not supported by the evidence where there was evidence supporting the State's theory that defendant slashed the victim as she attempted to escape from him, chased her into the living room where she fell to the floor, and then stabbed her to death.

**14. Constitutional Law § 63— death qualification of jury—constitutionality**

Death qualification of the jury in a first degree murder case did not violate defendant's constitutional rights to due process and to a jury representing a cross-section of the community.

**15. Criminal Law § 135.9— mitigating circumstance—extenuating relationship—refusal to submit—mental or emotional disturbance submitted**

The trial court in a first degree murder case did not err in refusing to submit defendant's proposed nonstatutory mitigating circumstance of an extenuating relationship between defendant and the victim where the trial court gave a peremptory instruction on the submitted circumstance that defendant committed the murder while under the influence of mental or emotional disturbance arising out of the state of his relationship with the victim.

**16. Criminal Law § 135.9— mitigating circumstance—no significant criminal history—submission not required**

The trial court did not err in refusing to submit as a mitigating circumstance for first degree murder that defendant did not have a significant history of prior criminal activity where neither defendant nor the State introduced evidence to show such mitigating circumstance.

**17. Criminal Law § 135.9— mitigating circumstances—jury's failure to answer all "yes" or "no"**

The fact that the jury did not answer all mitigating circumstances submitted for a first degree murder with either a "yes" or a "no," but put a dash following one statutory mitigating circumstance and left blank the catch-all provision for mitigating circumstances, did not render the verdict form constitutionally defective.

**18. Criminal Law § 135.9— nonstatutory mitigating circumstances—determination of mitigating value**

The trial court did not err in refusing to instruct the jury that if it found any nonstatutory mitigating circumstances, it must give them some mitigating value, since it is for the jury to determine whether submitted nonstatutory mitigating circumstances have mitigating value.

**19. Criminal Law § 102.12— capital case—argument that sentence not discretionary**

The district attorney properly stated the law in his sentencing argument in a first degree murder case when he argued that the sentence was not pure-

State v. Fullwood

ly a matter for the jury's discretion but must be determined "under the instructions of the Court."

**20. Criminal Law § 102.12— jury argument—Biblical references to death for murderer**

The trial court did not abuse its discretion by not intervening *ex mero motu* when, during the sentencing argument in a first degree murder case, the prosecutor read verses from the Bible which say that a murderer shall be put to death.

**21. Criminal Law § 135.8— especially heinous aggravating circumstance—constitutionality**

The "especially heinous, atrocious, or cruel" aggravating circumstance of N.C.G.S. § 15A-2000(e)(9) is not unconstitutionally subjective and arbitrary where the jury is instructed that it applies only to a "conscienceless or pitiless crime which is unnecessarily torturous to the victim."

**22. Criminal Law § 135.7— capital case—instructions on aggravating and mitigating circumstances**

The N.C. Pattern Jury Instruction does not unconstitutionally impose on the jury a duty to return a recommendation of death if it finds that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the death penalty.

**23. Criminal Law § 135.9— mitigating circumstances—requirement of unanimity**

The trial court did not err in instructing the jury that they must be unanimous before they could find the existence of a mitigating circumstance.

**24. Criminal Law § 135.10— death penalty not disproportionate**

A sentence of death imposed on defendant for first degree murder was not excessive or disproportionate to the penalty imposed in similar cases where the jury found that the murder was especially heinous, atrocious or cruel, and where the evidence showed that defendant brutally and repeatedly slashed and stabbed the victim in front of several small children, and that the victim suffered great physical and psychological pain before death.

Chief Justice EXUM concurring.

Justice FRYE dissenting as to sentence.

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) (1986) from a judgment imposing the sentence of death entered by *Snepp, J.,* at the 3 December 1985 Criminal Session of Superior Court, BUNCOMBE County. On 13 November 1986 we allowed defendant's petition to bypass the Court of Appeals in an appeal from a conviction of felonious breaking or entering. Heard in the Supreme Court 8 February 1988; additional arguments heard 22 August 1988.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Special Deputy Attorney General, for the State (original brief and argument); Lacy H. Thornburg, Attorney General, James J. Coman, Senior Deputy Attorney General, William N. Farrell, Jr., Special Deputy Attorney General, G. Patrick Murphy, Assistant Attorney General, and Barry S. McNeill, Assistant Attorney General, for the State (supplemental brief and argument).*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Robin E. Hudson, Assistant Appellate Defender, for defendant-appellant (original brief and argument); Malcolm Ray Hunter, Jr., Appellate Defender, and Louis D. Bilionis, for defendant-appellant (supplemental brief and argument).*

*E. Ann Christian and Robert E. Zaytoun for North Carolina Academy of Trial Lawyers, amicus curiae.*

*John A. Dusenbury, Jr., for North Carolina Association of Black Lawyers, amicus curiae.*

WHICHARD, Justice.

Defendant was convicted of first degree murder and felonious breaking or entering. The jury recommended the death sentence for the murder, and the trial court sentenced accordingly. It also sentenced defendant to ten years in prison for the breaking or entering. We find no error.

The State's evidence, in pertinent summary, showed the following:

Defendant and Deidre Waters had dated for approximately three and one-half years. They had a child, Michelle, born on 14 April 1984, and moved into an apartment together in August 1984. In early March 1985, defendant and Deidre had an argument, after which defendant left town for three weeks. While he was gone, defendant made several collect calls to Deidre at her apartment and at her workplace. Deidre tried to get the locks on the apartment changed. On 24 March 1985, defendant returned to town, broke into the apartment, and stayed there for a few days.

On 28 March, Deidre went to work as a day care teacher at the home of Michael and Camille Hawks. She called her grandmother and asked if she could spend the next several nights with

her. After work, Deidre went to defendant's mother's house, picked up Michelle, and went to her mother's home. Later that evening she drove her mother's beige car to the Buncombe County Courthouse and went to the magistrate's office. Magistrate James Maney testified that Deidre asked for a communicating threats warrant against defendant. Deidre told Maney that defendant had threatened to cut her head off and to cut her heart out and take it to her mother or grandmother. She told the magistrate she was planning to stay with her grandmother, and she requested a police escort to get clothes from her apartment.

Due to transportation problems, Deidre spent that night at her mother's house. She told her mother, Elaine Mills, that she was tired of defendant's threats and that she had taken out a warrant on him. Defendant called Ms. Mills five or six times during the night trying to find Deidre. At Deidre's request, Ms. Mills told defendant that she had not seen Deidre.

On the morning of 29 March, defendant again phoned Ms. Mills' home, but Deidre did not talk to him. At 7:45 a.m. defendant went to the home of an acquaintance, Betty Holloway, and asked if he could watch out her kitchen window for a beige car which would take him to work. Ms. Mills' home could be seen from Ms. Holloway's home. Defendant left the Holloway residence around 8:00 a.m.

At about the same time, Ms. Mills and Deidre left the Mills' home. A neighbor testified that he saw Deidre and Ms. Mills get into their car and drive away and that he then saw defendant jog down the hill in the direction of the car.

At 8:20 a.m. Ms. Mills dropped Deidre off at the Hawks' residence. While Ms. Hawks was still at home, Deidre received calls from defendant's mother and from defendant. Deidre told defendant's mother that she had taken out the warrant because she was tired of defendant threatening to cut her head off and to cut her heart out. Ms. Hawks left her home around 8:30 a.m.

At 9:30 a.m. Robin Ferrell arrived at the Hawks' home to leave her child at the day care center. She went to the front door, found the door locked, and began knocking. When there was no answer, she went to the front window. The window was broken. She saw blood in the house and heard the children crying. Ms.

Ferrell phoned Mr. Hawks from a neighbor's house; she then returned to the Hawks' home, coaxed the children to the window, and lifted them out. The children told her that Deidre was sleeping on the floor and that a man was sleeping on the floor with her.

When Mr. Hawks arrived, he and Ms. Ferrell went into the house. They found Deidre on the living room floor with her head against the base of the couch. She had no pulse and her eyes were open, dilated and glassy. Her neck was "severely cut," and her chest was "completely covered with blood." Defendant lay across her legs with his head near her lap. When Mr. Hawks pulled defendant off Deidre, defendant moaned and moved around. Mr. Hawks moved a knife, which was near defendant, to the foyer. He and Ms. Ferrell went outside to wait for the police.

At 10:00 a.m. medical personnel arrived and attempted to give first aid to defendant, who had a wound in his stomach and wounds on his neck and arms. Defendant fought with them. When they got him on the stretcher, he said, "Don't stab me anymore, don't stab me anymore." The paramedic who put defendant in the ambulance expressed the opinion that defendant was not in shock at that time.

Sergeant Ted Lambert and Detective Walt Roberson of the Asheville Police Department arrived at the scene at 10:10 a.m. Sergeant Lambert noticed the broken window and blood on the floor in the foyer. They found the bloody knife which Mr. Hawks had moved lying in the foyer. Deidre was lying on the living room floor with blood on her clothing, underneath her and throughout the living room. The paramedics were treating defendant. They found blood in the sitting room, on the outside of the first floor bathroom door and on the walls, mirror and commode in the bathroom. The bathroom door appeared to have been forced open. In the dining room they found defendant's grey jacket, pieces of the broken window glass, and the plastic from the window covering. The cord of the dining room telephone had been pulled from the jack, and the receiver lay on the floor. There was blood on the jacket, the window glass and plastic, the phone receiver, the walls and the floor.

In the kitchen they found blood on the floor, the counter, and the refrigerator. A bloody butcher knife with defendant's palm print on it lay on the kitchen counter, and a steak knife with

traces of blood on it lay under the high chair. There was also blood on the stairway and on the upstairs phone.

Lieutenant William Gibson of the Asheville Police Department took blood scrapings from many areas in the house. The tests revealed that the blood on the butcher knife was consistent with that of defendant and Deidre, the blood on the knife in the foyer was defendant's, and the steak knife did not have enough blood on it that the source of the blood could be traced. The blood throughout the house was consistent with that of either defendant or Deidre.

The autopsy on Deidre's body disclosed twenty-four significant wounds, most of which were slash wounds. Two of the wounds were capable of causing death: a deep slashing wound on her neck which cut her carotid artery, and a penetrating wound on her anterior chest which went into her right lung. Dr. George Lacy, the pathologist, testified that Deidre could have survived from fifteen to forty-five minutes after receiving the fatal wounds. The Chief Medical Examiner, Dr. Page Hudson, testified that, in his opinion, she died within a few minutes after receiving these wounds.

Dr. Frank Edwards, an emergency room doctor, testified that defendant was in shock when he was admitted to the hospital. Dr. Joseph Noto, the surgeon who treated defendant, testified that defendant had a series of parallel superficial cuts on his wrists and neck. He had a stab wound in his abdomen. Dr. Noto opined that because the wounds were straight and precise, the neck, wrist and abdomen wounds were all self-inflicted. Dr. Hudson agreed that the wrist and neck wounds were self-inflicted and said that it was "more likely than not" that the abdominal wound was self-inflicted, although "it could have been inflicted by someone else."

Grover Matthews, a police detective, testified that while defendant was in the emergency room he said that his girlfriend had stabbed him. The trial court did not allow this statement into evidence.

From the circumstantial evidence, the State developed the theory that defendant broke the dining room window and came into the house. Deidre, who was trying to phone for help, tried to keep him out. Defendant went to the kitchen and got the butcher knife. Deidre ran to the bathroom and locked herself in, but de-

fendant forced the door open and began stabbing her. She managed to get away and ran into the living room, where he caught her and inflicted the fatal wounds. He then selected a smaller knife from the kitchen and inflicted wounds upon himself.

The defense conceded that defendant had killed Deidre and asked for a verdict of guilty of second degree murder. Defense counsel argued that defendant was in an emotional turmoil, was stabbed in the stomach by Deidre, and did not premeditate or deliberate regarding the killing. Defense counsel presented several character witnesses for defendant. A clinical correctional psychologist testified to defendant's low IQ and opined that defendant's relationships with Deidre and Michelle were "the foundation of his life" and that he could not deal with his perception that Deidre was leaving him and taking Michelle with her.

On the murder charge, the jury considered possible verdicts of first degree murder on the basis of premeditation and deliberation and second degree murder. It returned a verdict of guilty of first degree murder. Following a capital sentencing hearing, the jury found as an aggravating circumstance that the murder was especially heinous, atrocious and cruel.[1] The defense asserted ten factors as mitigating circumstances. The jury found seven: (1) the murder was committed while defendant was under the influence of a mental or emotional disturbance; (2) defendant's immaturity or limited mental capacity at the time of the commission of the offense; (3) defendant sought the assistance of vocational rehabilitation to prepare himself for better employment; (4) defendant sought the assistance of the Human Resources Development Program of a technical college to prepare himself for better employment; (5) defendant has tried to maintain employment despite limited abilities; (6) defendant expressed remorse and sorrow for what he had done; and (7) the offense was committed by means of a weapon or weapons acquired at the Hawks' residence and not taken there by defendant. Of the three remaining mitigating circumstances submitted, the jury answered "no" to two and did not answer the other one. It also did not answer the "[a]ny other circumstance or circumstances arising from the evidence which you,

---

1. The statutory language for this aggravating circumstance is "heinous, atrocious, *or* cruel." N.C.G.S. § 15A-2000(e)(9) (1988) (emphasis added). The language submitted here was "heinous, atrocious *and* cruel." (Emphasis added.)

the jury, deem to have mitigating value" provision. N.C.G.S. § 15A-2000(f)(9) (1988). Upon a finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstance, and that the aggravating circumstance was sufficiently substantial to call for the death penalty, the jury recommended a sentence of death.

## GUILT PHASE

Defendant first contends that the trial court improperly denied his motion to sequester witnesses. He argues that several of the witnesses testified regarding threats that he allegedly made and that allowing them to hear one another's testimony created an atmosphere in which inconsistencies in the testimony "could have become undetectable." He also argues that because some of the witnesses were related, their simultaneous presence led to "a highly emotional situation."

[1] A ruling on a motion to sequester witnesses is reviewable only upon a showing of abuse of discretion. *State v. Holden*, 321 N.C. 125, 136, 362 S.E. 2d 513, 522 (1987), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 935 (1988); *State v. Young*, 312 N.C. 669, 677, 325 S.E. 2d 181, 186 (1985). Defendant made his motion pursuant to N.C.G.S. § 8C-1, Rule 615, and he argues that under this rule, unlike under N.C.G.S. § 15A-1225, a motion to sequester witnesses is not discretionary. We disagree.

The rule reads, in relevant part: "At the request of a party the court *may* order witnesses excluded so that they cannot hear the testimony of other witnesses . . . ." N.C.G.S. § 8C-1, Rule 615 (1988) (emphasis added). The commentary states: "The use of '*may* order witnesses excluded' rather than 'shall,' as in the federal rule, is intended to preserve discretion in the trial judge . . . ." N.C.G.S. § 8C-1, Rule 615 commentary (1988). We conclude that the trial court retains discretion under the rule. *See State v. Russell*, 84 N.C. App. 383, 390, 352 S.E. 2d 922, 926 (1987), *appeal dismissed and disc. rev. denied*, 319 N.C. 677, 356 S.E. 2d 784, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 363 (1987).

[2] "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Barts*, 316 N.C. 666, 679, 343 S.E. 2d 828, 839 (1986). The record indicates

that the trial court carefully considered defendant's motion and denied it only after hearing and weighing the concerns expressed by both defendant and the State. Before denying the motion, the court determined that there were no eyewitnesses to the crimes and that defendant had copies of the pretrial statements of the witnesses to use in cross-examination. We thus conclude that defendant has failed to establish an abuse of discretion in the denial of his motion to sequester witnesses.

[3] Defendant next contends that the prosecutor's use of peremptory challenges denied defendant's constitutional right to a trial by an impartial jury. He argues that of the jurors qualified to serve under the death qualification standard of *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776 (1968), the prosecutor used his peremptory challenges to eliminate all jurors not otherwise excused who expressed equivocal sentiments about the death penalty.

Peremptory challenges are established by statute. N.C.G.S. § 15A-1217 (1988). They may be exercised without a stated reason and without being subject to the control of the court. *State v. Jenkins*, 311 N.C. 194, 204, 317 S.E. 2d 345, 351 (1984). The sole exception is that upon a prima facie showing that the prosecutor used peremptories in a racially discriminatory manner, the prosecutor has the burden of establishing racially neutral reasons for exercising the peremptories. *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed. 2d 69 (1986). Defendant argues that the same rationale should apply to prevent the State from striking jurors because they have expressed equivocal sentiments about the death penalty.

*Batson* addressed only the specific problem of discrimination based on race.

That the Court will not tolerate prosecutors' racially discriminatory use of the peremptory challenge, in effect, is a special rule of relevance, a statement about what this Nation stands for, rather than a statement of fact. . . . Outside the uniquely sensitive area of race the ordinary rule that a prosecutor may strike a juror without giving any reason applies.

*Brown v. North Carolina*, 479 U.S. 940, 941-42, 93 L.Ed. 2d 373, 374 (1987) (O'Conner, J., concurring). Nothing in *Batson* or its

progeny compels further erosion of the unfettered use of peremptory challenges. " '*Batson* does not touch, indeed, it clearly reaffirms . . . the ordinary rule that a prosecutor may exercise his peremptory strikes for any reason at all.' . . . [P]rosecutors may '*take into account the concerns expressed about capital punishment by prospective jurors,* or any other factor, in exercising peremptory challenges . . . .' " *State v. Robbins*, 319 N.C. 465, 494, 356 S.E. 2d 279, 296-97 (1987), *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 226 (1988) (quoting *Brown v. North Carolina*, 479 U.S. at 941, 93 L.Ed. 2d at 374 (O'Conner, J., concurring) (emphasis added)). A juror's views on capital punishment, unlike his or her race, are directly related to potential performance on a capital jury. Thus, both the prosecutor and defense counsel may exercise peremptory challenges to exclude jurors based upon their voir dire testimony regarding their attitude toward capital punishment. *See State v. Allen*, 323 N.C. 208, 372 S.E. 2d 855 (1988).

[4] Defendant argues that by allowing the prosecutor to systematically exclude persons equivocal about capital punishment from the petit jury, the court denied him the right to an impartial jury composed of a fair cross-section of the community. This Court has not extended fair cross-section analysis to petit juries and adheres to the position taken by the United States Supreme Court. "We have never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." *Lockhart v. McCree*, 476 U.S. 162, 173, 90 L.Ed. 2d 137, 147-48 (1986), *quoted in State v. Jackson*, 317 N.C. 1, 21, 343 S.E. 2d 814, 826 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L.Ed. 2d 133 (1987); *see also State v. Evangelista*, 319 N.C. 152, 166, 353 S.E. 2d 375, 385 (1987).

Even if fair cross-section analysis were so extended, "jurors equivocal as to the death penalty" do not qualify as a distinctive group for fair cross-section purposes. In *Lockhart*, the United States Supreme Court found that persons who were not qualified to sit on capital juries were not a distinctive group. "[G]roups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the '*Witherspoon*-excludables'

. . ., are not 'distinctive groups' for fair-cross-section purposes." *Lockhart*, 476 U.S. at 174, 90 L.Ed. 2d at 148.

Here, as in *Lockhart*, the group is defined solely by shared ideas or values. Its members share no physical characteristics and belong to no common organization. The mere fact that they share similar feelings about capital punishment is insufficient to label them a distinctive group for purposes of fair cross-section analysis.

**[5]** Defendant next contends that the trial court erred in breaching the physician-patient privilege by allowing Dr. Joseph Noto to testify about defendant's wounds. We disagree.

The physician-patient privilege has no common law predecessor and is entirely a creature of statute. *State v. Martin*, 182 N.C. 846, 849, 109 S.E. 74, 76 (1921); 1 Brandis, *North Carolina Evidence* § 63, at 305 (3rd ed. 1988). The statute reads, in relevant part:

> No person, duly authorized to practice physic or surgery, shall be required to disclose any information which he may have acquired in attending a patient in a professional character. . . . *Any resident or presiding judge in the district, either at the trial or prior thereto, . . . may, subject to G.S. § 8-53.6, compel disclosure if in his opinion disclosure is necessary to a proper administration of justice.*

N.C.G.S. § 8-53 (1986) (emphasis added). The privilege thus "is not absolute; it is qualified by the statute itself." *Capps v. Lynch*, 253 N.C. 18, 22, 116 S.E. 2d 137, 141 (1960). Whether the privilege should be breached is a matter for the discretion of the trial court. *Id.* Defendant has failed to show an abuse of discretion in the trial court's ruling that Dr. Noto's testimony was "necessary to a proper administration of justice."

Defendant argues that because investigators obtained information from Dr. Noto before the trial court compelled his testimony, the privilege was breached prior to the court's inquiry, and the evidence thus should have been excluded. We find the contention without merit. The trial court received evidence and heard arguments before ruling that the privilege should be waived and the testimony allowed into evidence. The record does not establish that this ruling could not have been the result of a

reasoned decision. *See State v. Barts*, 316 N.C. at 679, 343 S.E. 2d at 839.

Defendant further asserts that by questioning Dr. Noto prior to obtaining a waiver of the physician-patient privilege, the investigators violated defendant's federal and state constitutional rights by subjecting him to an unreasonable search and seizure. We find no merit in this argument. Dr. Noto voluntarily gave the information to the police upon request. Evidence voluntarily given to police during a criminal investigation is not the product of an illegal search. "[W]hen evidence is delivered to a police officer upon request and without compulsion or coercion, the constitutional provisions prohibiting unreasonable search and seizure are not violated." *State v. Small*, 293 N.C. 646, 656, 239 S.E. 2d 429, 436 (1977); *see also State v. Reams*, 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied*, 404 U.S. 840, 30 L.Ed. 2d 74 (1971); *United States v. Pate*, 324 F. 2d 934 (7th Cir. 1963), *cert. denied*, 377 U.S. 937, 12 L.Ed. 2d 299 (1964).

Finally, assuming error, *arguendo*, the error was clearly harmless. Dr. Noto testified about defendant's wounds and his condition upon admission to the emergency room. He expressed the opinion that the wounds were self-inflicted. Two other doctors testified to essentially the same facts and opinions. Dr. Edwards, the emergency room physician, also testified to defendant's condition on admission and also opined that the wounds were possibly self-inflicted. Dr. Hudson, the Chief Medical Examiner, testified that he had examined defendant's medical records and photographs of defendant's wounds and that in his opinion the wounds were self-inflicted. Where improperly admitted evidence merely corroborates testimony from other witnesses, we have found the error harmless. *State v. Payne*, 312 N.C. 647, 656-59, 325 S.E. 2d 205, 211-13 (1985). We perceive no reasonable possibility that the jury would have reached a different result absent Dr. Noto's testimony. *See* N.C.G.S. § 15A-1443(a) (1988); *State v. Maynard*, 311 N.C. 1, 17, 316 S.E. 2d 197, 206 (1984).

[6] Defendant next contends that the trial court erred in allowing the pathologist who performed the autopsy on the victim to state his opinion as to the length of time between the victim's injuries and her death. The testimony at issue is as follows:

Q. Dr. Lacy, do you have an opinion as to how long Deidre Waters would have lived after receiving the two fatal wounds that you testified to?

A. I have an opinion, but it's more or less a guess, and that's that she could have survived anywhere from—

MR. BELSER: Objection, to a guess, your Honor.

COURT: Overruled.

—from fifteen minutes to forty-five minutes.

Defendant argues that use of the word "guess" makes this opinion mere speculation and therefore inadmissible.

Use of the word "guess" does not render an opinion inadmissible. "The term 'guess' is not regarded as being a mere conjecture or speculation but as a colloquial way of expressing an estimate or opinion. . . . [I]t is commonly used as meaning the expression of a judgment with the implication of uncertainty." *State v. Clayton,* 272 N.C. 377, 382-83, 158 S.E. 2d 557, 561 (1968); *see also Aarhus v. Wake Forest University,* 57 N.C. App. 405, 409, 291 S.E. 2d 837, 840 (1982). Expert witnesses are allowed to testify on a wide range of facts, the existence or nonexistence of which is ultimately to be determined by the trier of fact. *State v. Wilkerson,* 295 N.C. 559, 568, 247 S.E. 2d 905, 910 (1978). The words chosen by the witness go to the weight of the evidence, not its admissibility. *State v. Holden,* 321 N.C. 125, 144, 362 S.E. 2d 513, 526, *cert. denied,* --- U.S. ---, 100 L.Ed. 2d 935 (1988); *Aarhus v. Wake Forest University,* 57 N.C. App. at 409, 291 S.E. 2d at 840. Nothing in the Rules of Evidence, N.C.G.S. § 8C-1, alters these well established principles. Thus, use of the word "guess" did not render Dr. Lacy's testimony inadmissible.

[7] Defendant further argues that the trial court should have recognized his objection to this testimony as a request under Rule 705 for disclosure of the facts and data underlying the opinion. This rule provides: "The expert may testify in terms of opinion . . . without prior disclosure of the underlying facts or data, *unless an adverse party requests otherwise* . . . . The expert may in any event be required to disclose the underlying facts or data on cross-examination . . . ." N.C.G.S. § 8C-1, Rule 705 (1988) (emphasis added). Defendant made no specific request pursuant to this rule. We thus find this contention without merit.

[8] Defendant next contends that the trial court erred by refusing to admit evidence concerning his relationship with his daughter Michelle. The following exchange occurred on direct examination of defendant's mother by defense counsel:

Q. Can you describe [defendant's] relationship with the baby?

MR. BROWN: Objection.

COURT: Objection sustained.

Q. Did [defendant] care for the baby?

A. Yes.

MR. BROWN: Objection.

COURT: Objection is sustained. I don't know what relevance that has.

MR. BELSER: I think that will come clear, your Honor.

COURT: Let's get to it, then.

Q. Now, in the early part of March, about three weeks before Deidre was killed, did Michael and Deidre have some arguments over the baby?

A. They did.

Q. Was [defendant] afraid that the baby would be taken from him?

MR. BROWN: Objection to the leading.

COURT: Objection sustained.

Q. Had he talked to you about his fear that the baby would be taken from him?

MR. BROWN: Objection; self-serving.

COURT: Just answer "yes" or "no."

A. No, he did not.

Q. Do you know whether or not he had such a feeling?

MR. BROWN: Objection.

COURT: Objection sustained.

Evidence which is not relevant is not admissible. N.C.G.S. § 8C-1, Rule 402 (1988). "[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record." *State v. Simpson*, 314 N.C. 359, 370, 334 S.E. 2d 53, 60 (1985). *See also* N.C.G.S. § 8C-1, Rule 103 (1988); N.C.G.S. § 15A-1446(a) (1988). The relevance of the proffered evidence is not "obvious from the record," and defendant did not make an offer of proof showing the substance of what the witness would have testified. Where evidence is excluded, the record must show "the essential content or substance of the witness's testimony" before we can determine whether exclusion of the evidence was prejudicial. *State v. Satterfield*, 300 N.C. 621, 628, 268 S.E. 2d 510, 515-16 (1980).

Defendant argues that his mother's testimony would have explained his state of mind. Nothing in the record establishes this, however. Indeed, when asked whether defendant had talked to her about his fear that Michelle would be taken from him, his mother responded that he had not. We thus hold that this question is not before us for review.

[9] Defendant next contends that the trial court erred in refusing to admit defendant's statement in the emergency room that his girlfriend had stabbed him. He argues that although hearsay, the statement was admissible as an excited utterance under N.C.G.S. § 8C-1, Rule 803(2).

We have held that "to fall within this hearsay exception there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *State v. Smith*, 315 N.C. 76, 86, 337 S.E. 2d 833, 841 (1985). Here, Ms. Ferrell discovered the homicide at 9:30 a.m. At 10:00 a.m. medical personnel arrived and attempted to treat defendant. At 10:30 a.m. defendant went to the hospital. Sometime thereafter he told a police officer in the emergency room that his girlfriend had stabbed him. He thus made this statement over an hour after the crime was discovered, and the trial court properly could conclude that he had time to manufacture the statement and did not make it spontaneously.

**[10]**  Defendant next contends that the trial court erred in refusing to admit the entire packet of defendant's medical records. The exclusion of relevant evidence is proper "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1988). The trial court excluded these records on the ground that to admit them would be a waste of time. This decision was within its sound discretion. *State v. Mason*, 315 N.C. 724, 731, 340 S.E. 2d 430, 435 (1986). We find no abuse of that discretion. The records included large amounts of material which did not directly concern defendant's wounds, and the jury heard plenary testimony concerning those wounds. The significance to the case of the excluded portions of defendant's records was not established, and it was not error or an abuse of discretion to exclude them.

**[11]**  Defendant next contends that the trial court erred by allowing the prosecutor, over objection, to argue to the jury:

> Mr. Belser said the State has to prove to you that when [defendant] killed her he didn't act in passion. Well, the State doesn't have to prove that. The State has to prove that he formed this intent to kill her in a cold state of mind or blood at that point, but whether or not he was in passion when he killed her is immaterial.

Defendant asserts that this argument is an incorrect statement of the law.

We have stated: "If the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect." *State v. Misenheimer*, 304 N.C. 108, 113-14, 282 S.E. 2d 791, 795 (1981) (quoting *State v. Faust*, 254 N.C. 101, 108, 118 S.E. 2d 769, 773, *cert. denied*, 368 U.S. 851, 7 L.Ed. 2d 49 (1961)). The argument thus correctly states the law. Counsel may argue the relevant law to the jury. *State v. Brown*, 320 N.C. 179, 194, 358 S.E. 2d 1, 12, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 406 (1987); *State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E. 2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985). The court thus properly allowed this argument.

[12]   Defendant next contends that the trial court erred by refusing his request for the following instruction on premeditation and deliberation:

> An intent to kill may exist in other degrees of unjustifiable homicide, but only in first degree murder is that intent formed into a fixed purpose by deliberation and premeditation. This intent is defined as a steadfast resolve and deeprooted purpose, or a design formed after carefully considering the consequences. The fixed resolve to kill, which belongs to murder in the first degree, is something different from the minor quality of intention, which lacks the marked and distinguished characteristics or cold premeditation. The state of mind is described as a "cold state of blood."

*See State v. Thomas*, 118 N.C. 1113, 24 S.E. 431 (1896). The court instead gave the following instructions:

> Fourth, the State must satisfy you beyond a reasonable doubt that the defendant acted with premeditation. That is, that he formed the intent to kill the victim over some period of time, however short, before he acted.

> Fifth, the State must satisfy you beyond a reasonable doubt that the defendant acted with deliberation, which means that he acted while he was in a cool state of mind. Now, this does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excitement when the intent was carried into effect. However, if the intent to kill was formed and executed during some suddenly aroused violent passion, then the intent would not have been formed in a cool state of mind.

> Now, neither premeditation nor deliberation are usually susceptible of direct proof. They may be proved by circumstances from which they may be inferred, such as a lack of provocation by the victim, the conduct of the defendant before, during and after the killing, any threats and declarations of the defendant, any use of grossly excessive force or the infliction of lethal wounds after the victim was felled, or

brutal or vicious circumstances of the killing, or the manner in which or the means by which the killing was done.

If a party requests an instruction which is a correct statement of the law and is supported by the evidence, the court must give the instruction at least in substance. *State v. Corn*, 307 N.C. 79, 86, 296 S.E. 2d 261, 266 (1982). It need not give the instruction exactly as the party requests, however. *State v. Silhan*, 302 N.C. 223, 253, 275 S.E. 2d 450, 472 (1981). Defendant's requested instruction stressed that the intent to kill must be formed in a "cold state of blood." The instructions given emphasized this by stating that the intent to kill must have been formed "in a cool state of mind" and not "during some suddenly aroused passion." While different in form from those requested, they were, in substance, the same.

Defendant argues that the instructions were improper because they led the jurors to believe that they could only find that he did not have the intent necessary for first degree murder if they found that he had formed and carried out the intent to kill while under the influence of "some suddenly aroused violent passion." This instruction undermined his defense, he contends, because the evidence showed that his state of passion had existed for several days before the murder and was not one which was "suddenly aroused."

We have held that

[d]eliberation means that the intent to kill was formed while defendant was in a cool state of blood and not under the influence of a *violent passion suddenly aroused* by sufficient provocation. . . . "[A]lthough there may have been time for deliberation, if the purpose to kill was formed and immediately executed in a passion, . . . the murder is not deliberate and premeditated."

*State v. Misenheimer*, 304 N.C. at 113-14, 282 S.E. 2d at 795 (citations omitted) (emphasis added) (quoting *State v. Faust*, 254 N.C. at 108, 118 S.E. 2d at 773, *cert. denied*, 368 U.S. 851, 7 L.Ed. 2d 49 (1961)); *see also State v. Forrest*, 321 N.C. 186, 195, 362 S.E. 2d 252, 257 (1987). The court's instructions thus correctly stated the law.

[13]  Defendant also argues that the instructions permitted the jury to infer premeditation and deliberation from factors not supported by the evidence, asserting that there was no evidence to support "the infliction of lethal wounds after the victim was felled." We disagree.

The evidence showed that there was blood throughout the house, that the victim was found against the base of the couch, and that she had many slash wounds on her body, including two deep wounds capable of causing death. Viewed in the light most favorable to the State, this evidence supports the State's theory that defendant slashed the victim as she attempted to escape from him, chased her into the living room where she fell to the floor, and then stabbed her to death. The trial court, therefore, did not err in instructing that premeditation and deliberation may be proved by "the infliction of lethal blows after the victim was felled." *Cf. State v. Huffstetler*, 312 N.C. at 109-10, 322 S.E. 2d at 121 (submission of first degree murder to the jury proper because of evidence supporting premeditation and deliberation, including evidence that deceased died as a result of numerous wounds inflicted over period of time "from which it is reasonable to infer that many of the blows were inflicted after the deceased had been felled and rendered helpless").

[14]  Defendant finally contends that the trial court erred by allowing the jury to be "death qualified" before the guilt-innocence phase of his trial. He argues that this violated his constitutional rights to due process and to a jury representing a cross-section of the community because the resulting jury was biased in favor of the prosecution on the issue of guilt, thus depriving him of a fair trial. This argument is without merit. *Lockhart v. McCree*, 476 U.S. 162, 90 L.Ed. 2d 137 (1986); *State v. Evangelista*, 319 N.C. 152, 166, 353 S.E. 2d 375, 385 (1987); *State v. Johnson*, 317 N.C. 343, 375-76, 346 S.E. 2d 596, 614 (1986).

We conclude that the guilt phase of defendant's trial was fair and free of prejudicial error.

### SENTENCING PHASE

[15]  Defendant first contends that the trial court erred by refusing to submit his proposed nonstatutory mitigating circumstance that the relationship between him and the victim was extenuat-

ing. Defendant argues that the court thereby unconstitutionally precluded the jury from considering this aspect of his history as a mitigating circumstance. We hold that the court did not err.

The United States Supreme Court has held that "the [capital] sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110, 71 L.Ed. 2d 1, 8 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L.Ed. 2d 973, 990 (1978) (emphasis in original). Here, however, the jury was not precluded from considering defendant's relationship with the victim as a mitigating circumstance.

During the sentencing phase, defense counsel offered the testimony of Dr. Brad Fisher, a clinical correctional psychologist. Dr. Fisher testified, in part:

> [Defendant's] family life has not been particularly rich. He was given that fullness, he was given that richness with his girlfriend, Deidre, and his daughter. That was critical to him; it was central to him; it was the foundation of his life. . . . He has low self-esteem. He doesn't have much sense of self-identification. He found that and felt it in his core through his attachment to Deidre and to Michelle. These were central to his life.

> [I]t was his perception, his reality, that [Deidre] was leaving and that Michelle was leaving with her, and that . . . he could not tolerate. He did not have the ability to deal with that.

Dr. Fisher also testified that defendant had been "desperately anxious" over the "deteriorating" relationship between him and Deidre and that in the few days before the murder "[defendant's] desperation was growing more intense."

At the instructions conference, defense counsel requested that the court submit to the jury the mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2) (1988). The court agreed to submit this circumstance "because of the love-affair angle attached with this." Later, the court con-

sidered another of defense counsel's requested mitigating cir-
cumstances, that the relationship between defendant and the
victim was extenuating. Defense counsel stated that this circum-
stance was talking about the "love angle" to which the court had
referred, and that "[i]n the terms of the capital statute, a
mitigating factor which extenuates, this is a relationship between
parties that deteriorated, resulting in psychological damage to
the defendant." The court refused to submit the mitigating cir-
cumstance of an extenuating relationship. However, the court
agreed to give a peremptory instruction on the circumstance that
the defendant committed the murder while under the influence of
mental or emotional disturbance, stating: "all the evidence is that
[defendant] was upset about the relationship, and that's an emo-
tional disturbance."

When instructing the jury on the mitigating circumstance
that the murder was committed while defendant was under the
influence of mental or emotional disturbance, the court stated:

> A person is under such influence if he was in any way af-
> fected or influenced by mental or emotional disturbance at
> the time he killed. This is a mitigating circumstance which is
> prescribed by statute. Now, I instruct you, ladies and gentle-
> men, that all of the evidence tends to show that at the time
> of the killing the defendant was under the influence of a men-
> tal or emotional disturbance *arising out of the state of his re-
> lationship with the victim.* I therefore instruct you that you
> will answer "yes" as to the existence of the circumstance,
> and will consider it in mitigation.

(Emphasis added.) The court also instructed the jury to consider
"any other circumstance or circumstances arising from the evi-
dence which you, the jury, deem to have mitigating value." The
court's instructions thus clearly allowed—indeed, required—the
jury to consider defendant's relationship with the victim in deter-
mining defendant's sentence. Therefore, the court did not err in
refusing to submit defendant's requested nonstatutory mitigating
circumstance of an extenuating relationship between defendant
and the victim. *See State v. Lloyd,* 321 N.C. 301, 313-14, 364 S.E.
2d 316, 323, *vacated and remanded for reconsideration on other
grounds,* --- U.S. ---, 102 L.Ed. 2d 18 (1988) (court did not err in
refusing to submit two nonstatutory mitigating circumstances
regarding defendant's criminal record where a submitted statu-

tory mitigating circumstance allowed the jury to consider defendant's criminal record as a whole).

**[16]** Defendant next contends that the trial court erred by refusing to submit as a mitigating circumstance that he did not have a significant history of prior criminal activity. At the instructions conference, the court announced that it would submit as a mitigating circumstance that defendant had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1) (1988). The district attorney replied that defendant did have a criminal record, but that it would have been error for the prosecution to have introduced that record at trial. The court then decided not to submit the circumstance.

In *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981), the defendant argued that the trial court erred in not submitting the mitigating circumstance that the defendant had no significant history of prior criminal activity. There, neither the defendant nor the State had put on any evidence of the presence or absence of prior criminal activity. We held that "[i]t is the responsibility of the defendant to go forward with evidence that tends to show the existence of a given mitigating circumstance and to prove its existence to the satisfaction of the jury" and that "[s]ince defendant did not go forward with evidence in this regard, nor was there any evidence introduced by the state on this point, the trial court was not obligated to instruct the jury on this mitigating circumstance . . . ." *Id.* at 356, 279 S.E. 2d at 809. *Cf. State v. Wilson*, 322 N.C. 117, 367 S.E. 2d 589 (1988) (where State offered evidence showing that defendant had a prior felony conviction); *State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316 (where both defendant and State offered evidence of defendant's prior convictions).

Here, as in *Hutchins*, neither defendant nor the State introduced evidence to show that defendant had no significant history of prior criminal activity. Therefore, the court did not err in refusing to instruct the jury on this mitigating circumstance.

**[17]** Defendant next contends that the verdict form on which the jury recommended the death sentence was constitutionally defective. The second section on the verdict form asked, "Do you unanimously find from the evidence the existence of one or more of the following mitigating circumstances?" The submitted mitigating circumstances then followed, each with a blank for the jury's answer. Of the eleven mitigating circumstances submitted, the jury answered "yes" to seven and "no" to two. The jury put a

dash in the blank following the statutory mitigating circumstance that defendant's ability to appreciate the criminality of his conduct was impaired. N.C.G.S. § 15A-2000(f)(6) (1988). Finally, the jury left blank the "[a]ny other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value" statutory provision. N.C.G.S. § 15A-2000(f)(9) (1988). Defendant argues that the dash and blank answers are ambiguous and could indicate that the jury ignored evidence of those circumstances.[2]

Although it is the better practice for a jury to specify on the verdict form which mitigating circumstances it finds and which it does not find, there is no constitutional or statutory requirement that it do so. *State v. Pinch*, 306 N.C. 1, 32, 292 S.E. 2d 203, 226, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982); *State v. Rook*, 304 N.C. 201, 231, 283 S.E. 2d 732, 751 (1981), *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1982). In *State v. McLaughlin*, 323 N.C. 68, 372 S.E. 2d 49 (1988), we held that the trial court properly instructed the jury that it must write an answer in all of the aggravating circumstance blanks, but that it could leave the blank after a mitigating circumstance empty if it did not find the circumstance by a preponderance of the evidence. *Id.* at 107-08, 372 S.E. 2d at 74. The fact that the jury here did not answer all the circumstances with a "yes" or "no" does not, therefore, render the verdict form constitutionally defective.

[18] Defendant next contends that the trial court erred by refusing to instruct the jury that if it found any nonstatutory mitigating circumstances, it must give them some mitigating value. Defendant argues that to allow the jury to conclude that a mitigating circumstance exists, but to refuse to give it value because the jury does not unanimously deem it to have mitigating weight, violates *Lockett v. Ohio*, 438 U.S. 586, 57 L.Ed. 2d 973 (1978).

*Lockett* holds that "the sentencer . . . [may] not be precluded from considering *as a mitigating factor*" any evidence which the

2. Defendant contends that the jury also left blank the nonstatutory circumstance that "defendant has tried to maintain employment despite his limited abilities." The printed record does show a blank below this circumstance. However, the transcript indicates the trial court stated that the jury had answered this circumstance "yes." We therefore have checked the original issues for sentencing form in the Buncombe County Clerk's office, and the original form shows that the jury answered this issue "yes."

defendant proffers as a basis for a sentence less than death. *Id.* at 604, 57 L.Ed. 2d at 990 (emphasis in original). Neither may a sentencer *refuse* to consider any relevant mitigating evidence. *Eddings v. Oklahoma,* 455 U.S. at 114, 71 L.Ed. 2d at 11. However, neither *Lockett* nor *Eddings* requires that the sentencer must determine that the submitted mitigating circumstance has mitigating value. *See Raulerson v. Wainwright,* 732 F. 2d 803, 806-07 (11th Cir.), *cert. denied,* 469 U.S. 966, 83 L.Ed. 2d 302 (1984).

We have held that if a jury determines that a statutory mitigating circumstance exists, it is not free to refuse to consider the circumstance in its final sentence determination, although "[t]he weight any circumstance may be given is a decision entirely for the jury." *State v. Kirkley,* 308 N.C. 196, 220-21, 302 S.E. 2d 144, 157-58 (1983), *overruled on other grounds, State v. Shank,* 322 N.C. 243, 367 S.E. 2d 639 (1988). By including specific mitigating circumstances in the death penalty statute, the legislature has determined that those circumstances have mitigating value. *See State v. Pinch,* 306 N.C. at 27, 292 S.E. 2d at 223 (statutory mitigating circumstance presumed to be one which the jury reasonably could deem to have mitigating value). If the jury finds the existence of a statutory mitigating circumstance, it has "found" that circumstance and cannot determine that it does not have mitigating value.

It is, however, for the jury to determine whether submitted nonstatutory mitigating circumstances have mitigating value. The "catch-all" provision for mitigating circumstances includes those circumstances which are not listed as statutory mitigating circumstances—"[a]ny other circumstance[s] arising from the evidence *which the jury deems to have mitigating value.*" N.C.G.S. § 15A-2000(f)(9) (1988) (emphasis added). The court must submit to the jury the nonstatutory mitigating circumstances which the defendant requests if they are "supported by the evidence, and . . . are such that the jury could *reasonably* deem them to have mitigating value." *State v. Pinch,* 306 N.C. at 26, 292 S.E. 2d at 223 (quoting *State v. Johnson,* 298 N.C. 47, 72-74, 257 S.E. 2d 597, 616-17 (1979) ). The jury only "finds" a nonstatutory mitigating circumstance if it finds that the evidence supports the existence of the circumstance *and* if it deems it to have mitigating value. The pattern jury instruction for submitted nonstatutory mitigating circumstances reads:

If you do unanimously find by a preponderance of the evidence that any of the following circumstances exist and they are deemed by you to have mitigating value, you will so indicate by having your foreman write 'yes' in the space after the mitigating circumstances . . . . If you do not unanimously find this circumstance to exist *or* do not deem it to have any mitigating value, you will so indicate by having your foreman write 'no' in the space provided.

N.C.P.I.—Crim. 150.10, at 33-34 (1988). Although evidence may support the existence of the nonstatutory circumstance, the jury may decide that it is not mitigating. Therefore, the court did not err in denying defendant's requested instruction that if the jury found any nonstatutory mitigating circumstances, it must give them some mitigating value.

Defendant next contends that the trial court erred by not intervening *ex mero motu* in the district attorney's sentencing argument. The district attorney argued, in part:

[W]hen in God's name are we going to get concerned about the victim's rights? The only . . . way that the victims can be protected is . . . if juries apply the law. Not what they wish that it was, not applied with emotion or in a rage, but apply the law. Apply the law. And that's the only way victims can be protected. That is the only way that justice will ever come from this courtroom. That's the only way Deidre's memory will have some justice to it is if juries apply the law.

You're not on this jury just to apply your discretion. You're not on this jury to do the easy thing. Each and every one of you, each and every one of you said that you could sit on this jury, you could listen to the evidence and you would apply the law. And that's what the State's asking you to do is to apply the law.

. . .

Now those are the four issues [aggravating and mitigating circumstances] you're going to have to answer. It's not a matter of your discretion. Those issues you're going to have to answer under the instructions of the Court . . . .

The first issue . . . "Do you, the jury, unanimously find from the evidence beyond a reasonable doubt the existence of the aggravating circumstance that this murder was especially

heinous, atrocious and cruel?" It's an aggravating circumstance that's required by law.

. . .

Now, Mr. Belser's going to have the last argument in this case, and I have no idea what he's going to get up here and argue to you. He might argue that the Bible says, "Thou shalt not kill," and that applies to the State as well as it does to individuals. Ladies and gentlemen, I almost hesitate—I don't like to argue the Bible, but let's look at that just a minute.

The district attorney then read verses from the Bible which say that anyone who kills another person shall be put to death. Defendant did not object to any of these statements by the district attorney.

Defendant argues that the district attorney misled the jurors about the law, that he attempted to get them to ignore their duty to weigh aggravating and mitigating circumstances, and that he instructed them that they had no choice in whether to recommend the death sentence because God's law required it. Because defendant did not object at trial, we must decide whether the court's failure to intervene *ex mero motu* was an abuse of discretion.

[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*State v. Brown*, 320 N.C. 179, 194-95, 358 S.E. 2d 1, 12, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 406 (1987) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E. 2d 752, 761 (1979)).

For the following reasons, we find no abuse of discretion:

[19]  First, the district attorney stated that the jurors should apply the law, not just exercise their discretion. We have held that a jury may not exercise "unbridled discretion" in recommending a sentence, but must exercise "guided discretion *in making the underlying findings*" and weighing aggravating and mitigating circumstances. *See State v. Pinch*, 306 N.C. at 33, 292 S.E. 2d at 227; *State v. Williams*, 305 N.C. 656, 689, 292 S.E. 2d 243, 263, *cert.*

*denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). Therefore, the district attorney properly stated the law in arguing that the sentence was not purely a matter for the jury's discretion but must be determined "under the instructions of the Court."

[20]  Second, we have held in other cases that the trial court did not abuse its discretion by not intervening *ex mero motu* when, during closing arguments, the prosecutor read verses from the Bible which say that a murderer shall be put to death. *State v. Zuniga,* 320 N.C. 233, 267-68, 357 S.E. 2d 898, 920, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 384 (1987); *State v. Brown,* 320 N.C. 179, 206, 358 S.E. 2d 1, 19, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 406 (1987). We therefore hold that the trial court did not abuse its discretion here.

[21]  Defendant next contends that N.C.G.S. § 15A-2000(e)(9), which allows the jury to find as an aggravating circumstance that the murder was "especially heinous, atrocious, or cruel," is unconstitutional because it is subjective and arbitrary and does not meaningfully distinguish one murder from another. Defendant's argument has no merit.

In *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038, 72 L.Ed. 2d 155 (1982), the defendant argued that this circumstance was unconstitutional because it "requires a subjective evaluation of the evidence by the jurors." *Id.* at 224, 283 S.E. 2d at 746. We held that the circumstance was constitutional because our interpretation of "especially heinous, atrocious, or cruel" had been approved by the United States Supreme Court in *Proffitt v. Florida,* 428 U.S. 242, 49 L.Ed. 2d 913 (1978). *State v. Rook,* 304 N.C. at 224, 283 S.E. 2d at 747; *see also State v. Goodman,* 298 N.C. 1, 25-26, 257 S.E. 2d 569, 585 (1979). In *Proffitt,* the Supreme Court had held that Florida's "especially heinous, atrocious, or cruel" aggravating factor, construed by the Florida Supreme Court as "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," was not unconstitutional. "We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." *Proffitt,* 428 U.S. at 255-56, 49 L.Ed. 2d at 925 (citations omitted).

Here, the trial court gave the following instruction from N.C.P.I.—Crim. 150.10: "For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing. *This murder must have been a consciencelessness [sic] or pitiless crime which was unnecessarily torturous to the victim.*" (Emphasis added.) We hold, pursuant to *Proffitt,* that the jury received adequate guidance concerning the meaning of the "especially heinous, atrocious, or cruel" aggravating circumstance, and that the verdict therefore was not "subjective and arbitrary."

A recent United States Supreme Court case held that the "especially heinous, atrocious, or cruel" aggravating circumstance in Oklahoma's death penalty statute was unconstitutionally vague because it did not give the jury any guidance concerning the meaning of "especially heinous, atrocious, or cruel." *Maynard v. Cartwright,* 486 U.S. ---, 100 L.Ed. 2d 372 (1988). In *Maynard,* the trial court did not instruct the jury that the "especially heinous, atrocious, or cruel" aggravating circumstance was limited to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *See Cartwright v. Maynard,* 822 F. 2d 1477, 1488-89 (10th Cir. 1987), *aff'd,* 486 U.S. ---, 100 L.Ed. 2d 372 (1988). The present case is distinguishable because that instruction was given here. We thus hold that submission of the "especially heinous, atrocious, or cruel" aggravating circumstance here, for consideration in light of the foregoing instruction, was constitutionally permissible.

Defendant next contends that N.C.G.S. § 15A-2000 is unconstitutional. This argument is without merit. *E.g., State v. Benson,* 323 N.C. 318, 327, 372 S.E. 2d 517, 522 (1988); *State v. Johnson,* 317 N.C. 343, 385, 346 S.E. 2d 596, 620 (1986).

[22] Defendant next contends that the North Carolina Pattern Jury Instruction unconstitutionally imposed on the jury a duty to return a recommendation of death if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the death penalty. This argument is without merit. *State v. Robbins,* 319 N.C. 465, 515, 356 S.E. 2d 279, 308-09 (1987), *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 226 (1988).

[23]  Finally, defendant contends that the trial court erred in instructing the jurors that they must be unanimous before they could find the existence of a mitigating circumstance. Defendant bases this argument on *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 381 (1988). For the reasons expressed in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), we reject this argument.

We conclude that the sentencing phase of defendant's trial was fair and free of prejudicial error.

### PROPORTIONALITY REVIEW

Because we have found no error in the guilt and sentencing phases, we are required to review the record and determine: (1) whether the record supports the jury's findings of the aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E. 2d 279, 315 (1987), *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 226 (1988).

The jury found, as an aggravating circumstance, that the murder was especially heinous, atrocious and cruel. N.C.G.S. § 15A-2000(e)(9) (1988).[3] We hold that the evidence supports this aggravating circumstance. We further conclude that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

[24]  In conducting proportionality review, we "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown*, 315 N.C. 40, 70, 337 S.E. 2d 808, 829 (1985), *cert. denied*, 476 U.S. 1165, 90 L.Ed. 2d 733 (1986). We use the "pool" of similar cases as defined in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). *Id.*

---

3. See footnote 1. above.

However, "[w]e do not find it necessary to extrapolate or analyze *in our opinions* all, or any particular number, of the cases in our proportionality pool." *State v. Robbins*, 319 N.C. at 529, 356 S.E. 2d at 316 (emphasis in original).

Of the seven cases in which this Court has found the death penalty disproportionate, only two—*State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653 (1987), and *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983)—involved the aggravating circumstance that the murder was especially heinous, atrocious or cruel. Neither is similar to this case.

In *Stokes*, the defendant and several others planned to rob a man; during the robbery one of the assailants struck the victim with a stick, killing him. *Stokes*, 319 N.C. at 3, 352 S.E. 2d at 654. There are three points of distinction between *Stokes* and this case. First, the defendant in *Stokes* was seventeen years old; defendant here is twenty-nine years old. Second, in *Stokes* there was no evidence showing who was the leader in the robbery or that the defendant deserved death any more than an older partici- pant who received a life sentence. Third, the defendant in *Stokes* was convicted on a felony murder theory and there was little or no evidence that he premeditated the killing. Here, defendant was convicted on a premeditation and deliberation theory and there was ample evidence of premeditation.

In *Bondurant*, the defendant shot the victim while they were riding in a car. *Bondurant*, 309 N.C. at 677, 309 S.E. 2d at 173. In finding the death sentence disproportionate, this Court empha- sized the fact that the defendant there attempted to get immedi- ate medical care for the victim. After the shooting, he directed the driver of the car to go to the  hospital. He then went inside to get medical treatment for the victim. *Id.* Here, by contrast, when ambulance drivers arrived, defendant did not express any concern for the victim; instead, he acted as if the victim had been stab- bing him. His later expressions of remorse are hardly comparable to the actions of the defendant in *Bondurant*.

There are three cases in the pool in which the jury recom- mended a sentence of death after finding as the only aggravating circumstance that the murder was especially heinous, atrocious or cruel. *State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673, *cert. denied*, 479 U.S. 871, 93 L.Ed. 2d 166 (1986); *State v. Huffstetler*,

312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985), and *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, 454 U.S. 933, 70 L.Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L.Ed. 2d 655 (1981). We found the death sentence proportionate in these three cases.

In two of these cases, *Gladden* and *Martin*, the jury did not find any mitigating circumstances. However, in *Huffstetler* the jury found three mitigating circumstances: (1) that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; (2) that the killing occurred contemporaneously with an argument and by means of an instrument acquired at the scene and not taken there; and (3) that the defendant did not have a history of violent conduct. *Huffstetler*, 312 N.C. at 100, 322 S.E. 2d at 116.

We find *Huffstetler* similar to this case. First, the jury in *Huffstetler* found one aggravating circumstance—that the murder was "especially heinous, atrocious or cruel." Second, two of the three mitigating circumstances found are similar to those circumstances found here. They involve the defendant's mental or emotional state at the time of the murder and whether he took a weapon when he went to the murder scene. Finally, the facts in *Huffstetler* are very similar to the facts in this case. There, the defendant beat his mother-in-law to death with a frying pan after an argument. The victim had multiple wounds and lacerations on her head, neck and shoulders. Her jaw, neck, spine and left collarbone were fractured.

> The evidence presented at trial supports the view that the sixty-five year old female victim was brutally beaten to death during a prolonged attack in her own home. The defendant struck the victim with a cast-iron skillet at least fourteen times, breaking her jaws, collarbone and spine and fracturing her skull in several places. The deceased was struck repeatedly with enough force to spatter blood throughout the room in which she was killed. The blows struck were with sufficient force to push a portion of the victim's skull into her brain and expose brain tissue.
>
> . . .
>
> Thus, the record before us reveals a senseless, unprovoked, exceptionally brutal, prolonged and murderous assault

by an adult male upon a sixty-five year old female in her home. Having compared the defendant and the crime in this case to others in the pool of similar cases, we conclude that the sentence of death entered by the trial court is not disproportionate.

*Id.* at 117-18, 322 S.E. 2d at 126.

Here, similarly, defendant brutally and repeatedly slashed and stabbed the victim, inflicting twenty-four significant wounds, two of which—a slashing wound on her neck which cut the carotid artery, and a stab wound into her right lung—were capable of causing death. The evidence shows that the attack was prolonged: defendant forced open the bathroom door to get to the victim; he chased her throughout the house, slashing and stabbing her; and he finally cornered her in the living room and inflicted the fatal wounds. Whether the victim survived fifteen to forty-five minutes after receiving those wounds, as one expert testified, or a few minutes, as another expert testified, she went through some period of physical and psychological suffering after the slashing and stabbing had ended.

The facts here support the imposition of the death penalty even more strongly than do the facts in *Huffstetler*. There was no evidence that defendant here was under the influence of alcohol or drugs, as there was in *Huffstetler*. There is evidence that defendant planned the murder in advance. He threatened to kill the victim a day or so before the murder. The language used in making the threats undoubtedly invoked psychological suffering beyond the normal; defendant did not threaten merely to kill the victim, but also to cut her head off and cut her heart out and take it to her mother or grandmother. On the morning of the murder he watched the victim leave her mother's house, then followed her down the hill. The defendant in *Huffstetler*, by contrast, testified that he hit his mother-in-law during an argument.

There are two considerations here which were not present in *Huffstetler*. First, defendant repeatedly stabbed and slashed the victim to death in front of several small children. Second, the evidence supports the conclusion that the victim went through a period of psychological suffering in the day or so leading up to the murder. After defendant threatened to kill her, she swore out a warrant against him, planned to stay with her family, and re-

quested a police escort to get clothes from her apartment. On the night before the murder, defendant repeatedly phoned the victim's mother and asked to speak to the victim.

Finally, the facts of this case are similar to those of two other cases in the pool in which the defendants murdered their former girlfriends—*State v. Boyd,* 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied,* 471 U.S. 1030, 85 L.Ed. 2d 324 (1985), and *State v. Spruill,* 320 N.C. 688, 360 S.E. 2d 667 (1987), *cert. denied,* --- U.S. ---, 100 L.Ed. 2d 934 (1988). We held the death sentence proportionate in both of those cases.

In *Boyd,* the defendant was convicted of killing his former live-in girlfriend. The defendant met the victim. As she attempted to leave, he pulled out a knife and stabbed her repeatedly in front of her mother and her daughter. The victim suffered considerably before her death. She had difficulty breathing and she "rak[ed] [her hands] back and forth in the dirt." *Boyd,* 311 N.C. at 413, 319 S.E. 2d at 194. The victim had thirty-seven stab wounds on her body, including five penetrating wounds to her lungs and some defensive wounds on her hands. *Id.* The jury found as aggravating circumstances that the murder was especially heinous, atrocious or cruel and that the defendant previously had been convicted of a felony involving the use or threat of violence to the person. The jury found one or more unspecified mitigating circumstances of the sixteen circumstances submitted. *Id.* at 415-17, 319 S.E. 2d at 195-96.

In *Spruill,* the defendant was convicted of killing his former girlfriend. On the evening of the murder, the defendant followed the victim around at a nightclub. When the victim prepared to leave, she seemed very afraid of the defendant. He began chasing the victim, then stabbed her and cut her throat, causing her to strangle on her own blood. *Spruill,* 320 N.C. at 690-92, 360 S.E. 2d at 668-69. The jury found the aggravating circumstance that the murder was especially heinous, atrocious or cruel. *Id.* at 694, 360 S.E. 2d at 670. It found none of the five submitted mitigating circumstances. *Id.* at 701, 360 S.E. 2d at 674.

Although these cases differ from the present case in the numbers of aggravating and mitigating circumstances found, they have characteristics similar to those in the present case: (1) a

murder of a former girlfriend after previous threats to her; (2) fear on the part of the victim; (3) brutal, premeditated stabbings in front of other people; and (4) a period of time in which the victim suffered great physical and psychological pain before death.

We find that *Huffstetler, Boyd,* and *Spruill* are the cases in the pool most comparable to this case. In light of these cases, we cannot say that the death penalty recommendation in this case was excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We hold that the defendant received a fair trial and sentencing hearing, free of prejudicial error. In comparing this case to similar cases in which the death penalty was imposed, and in considering both the crime and the defendant, we cannot hold as a matter of law that the death sentence was disproportionate or excessive. *State v. Robbins,* 319 N.C. at 529, 356 S.E. 2d at 317.

No error.

Chief Justice EXUM concurring.

I concur with the majority's treatment of all issues in the guilt and sentencing phases of this trial.

If, in the sentencing phase, the Court were addressing the unanimity instruction issue for the first time, I would agree with defendant's position that these instructions violate the Eighth Amendment to the federal constitution as that amendment was interpreted in *Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384 (1988), for the reasons stated in my dissenting opinions in *State v. McKoy,* 323 N.C. 1, 372 S.E. 2d 12 (1988), and *State v. Allen,* 323 N.C. 208, 372 S.E. 2d 855 (1988). The majority's position on this issue is, as a result of the Court's decisions in *McKoy* and *Allen,* the law of this state to which I am now bound. For this reason I concur with the majority's treatment of this issue.

Justice FRYE dissenting as to sentence.

For the reasons expressed in the Chief Justice's dissenting opinions in *State v. McKoy,* 323 N.C. 1, 372 S.E. 2d 12 and in *State v. Allen,* 323 N.C. 208, 372 S.E. 2d 855 (1988), I believe the United States Supreme Court's decision in *Mills v. Maryland,* 486

U.S. ---, 100 L.Ed. 2d 384 (1988), requires that defendant be given a new sentencing hearing. Accordingly, I dissent from that portion of the Court's opinion which rejects defendant's argument based upon the holding of *Mills.* I concur in the result reached by the majority on the guilt phase issues.